Milligan, J.,
delivered the opinion of the court:
This action is brought under the Act UMh March, 1863, and the claimant asks the judgment of this court for the net proceeds of three hundred and two bales of cotton, which he avers, in his petition, were captured by the United States in Savannah, Georgia, in 1864, sold in New York, and the proceeds paid into^ the Treasury. ■
It is shown that the claimant is an alien, and resident of France; and that the cotton was purchased .about the 1st of January, 1863, in the State of Georgia, by one E. T. Henderson, who shortly thereafter claimed to be the agent of the claimant. The exact time when Henderson was constituted agent, or the circumstances or manner of his appointment,, except by implication, do not appear in the record. Prior to the war Henderson resided in New Orleans, and about the time or soon after hostilities were inaugurated he removed to Atlanta, Georgia. But it does not appear while he was in the State of Louisiana he acted as the agent of the claimant, or received or assumed any control over his property left in that State after the claimant removed back to France.
There is no proof of the appointment of Henderson as the agent of complainant, except as it is derived through his acts as such, and a reference made, in a letter written under date of the 2d of May, 1863, to the French vice-consul at Eichmond, Yirginia, in which he refers to his “ instruetims,” but this letter-is not produced, and we are left, in the absence of all direct proof to the contrary, to infer from the acts of the agent the time of his appointment, which we feel authorized from the proof to fix at or shortly before the x>urchase of the cotton in Summerville, Georgia, in January, 1863.'
At this time the claimant was resident in Bordeaux, France,, and there is no evidence even tending to prove that he furnished his agent either money, property, or securities, while in France, with which to purchase the cotton. Henderson paid for it, but where he obtained the means to do so does not appear. He set up no claim to it, and so repeatedly and emphatically *318 declared bis agency in respect to it tbat we do not doubt tbe bojia fide of bis conduct. He is now dead, and many things which are left in doubt, were he living, could doubtless be made clear and plain, but enough appears to satisfy the court that the cotton was purchased by Henderson as the agent of the claimant, in January, 1863, and that the title was intended thereby to be passed to the claimant.
If there was any doubt as to the authority of the agent, those doubts are removed by the claimant’s ratification of his acts, as far as he could do so by the institution of this suit.
In this state of the case, the first question which presents itself for our decision involves the right of the claimant to maintain this action. Heretofore we have had the question before us whether or not a citizen of the United States, resident in a loyal State, could appoint an agent within the insur-rectionary States, pending the war, to collect' the debts of the former due there, and invest the proceeds in other property, and then sue, after the capture of such property, in this court, and recover against the government. This question was settled by the Supreme Court in the case of The United States v. Grossmeyer, (9 Wal. R., 72.) In that case it was held that, under the acts of Congress commonly known as the “ non-intercourse acts,” as well as on grounds of public law, one belligerent could not lawfully appoint an agent in the territory of the other, and that such intercourse with an enemy was unlawful to parties standing in the relation of debtor and creditor, as well as it was to those who did not bear that relation to each other j and therefore an action, after the capture of property thus purchased, could not be maintained against the government, tinder the captured and abandoned property acts.
But the question nowpresented is widely different from the one decided in Grossmeyer1 s Case. Here the claimant is a subject of the French government, which, by a decree of the Emperor as early as June,* 18G1, was declared to be strictly neutral in the struggle between the government of the Union and the States which proposed to form a separate confederation. The agency was created while the government of France bore this relation toward both belligerent parties, and in itself contains nothing under public law which might not have been carried out in the loyal States without violating any principle of neutrality.
*319 It appears well settled that the duties and obligations imposed on a neutral in case of an international war are equally binding in case of a civil war. There is, when an internal commotion has swelled to the dignity of a civil war, and separated the community into two hostile bands, no essential difference in the two cases. (Prize Cases, 2 Black, 635.)
The neutral in both, so far as its conduct relates to the war then being waged, whether foreign or domestic, is bound to observe a strictly impartial course between the belligerents. He cannot do for the one what he may not do for the other, and hence he is not at liberty to mis himself in the war, or to favor either party at the expense of the other. (Halleck on International Law, p. 516 ; Lawrence’s Wheaton, p. 697: Yattel, pp. 335, 336.)
But this strictness only relates to the war ; it does not extend to commercial relations. The rule on this subject is well laid down by our Supreme Court in the case of The Bermuda, 3 Wal. B., 551.)
The learned Chief Justice, in pronouncing the judgment of the court, says:
“ Neutral trade is entitled to protection in all courts. Neutrals, in their own country, may sell to' belligerents whatever belligerents choose to buy. The principal exceptions to this rule are, that neutrals must not "sell to one belligerent what they refuse to sell to the other, and must not furnish soldiers or sailors to either; nor prepare, nor suffer to be prepared within their territory, armed ships, or military or naval expeditions against either. So, too, except goods contraband of war, or conveyed with intent to violate a blockade, neutrals may transport to belligerents whatever belligerents may agree’ to take. And so, again, neutrals may convey in neutral ships, from one neutral port to another, any goods, whether contraband of war or not, if intended for actual delivery at the port of destination, and to become part of the common stock of the country or the port.”
On this rule, which accords with the principles of international law, as declared by leading publicists and writers on public law, it cannot be doubted that commercial intercourse between a neutral state and a belligerent power is not only lawful, but to be protected by all courts, as long as such trade *320 is impartial, and not intended to violate any blockade or siege, or to deal in goods contraband of war.
But it must be observed that tbis rule is founded on tbe public law, which, in this respect, has little or nothing to do with the local or municipal law of the country where such trade is carried on. The former is international in its effect, and regulates the intercourse, in war or in peace, between independent communities, while the latter is territorial in its binding force, and intended to operate on all citizens or subjects, or others, either permanently or temporarily residing in such state. But both may well stand together, and in perfect harmony with each other.
In time of war, whether foreign or domestic, every government has the undoubted right to adopt such extraordinary measures-, and to enact such laws under its constituted forms of government ás its interest and safety may demand. And to this end, as early as the 19th of April, 1801, the President, by proclamation, declared all the ports-of the. insurrectionary States in a state of blockade. And on the 13th of July, in the same j'ear, Congress passed an act authorizing the President to interdict, by proclamation, all trade and intercourse between' the inhabitants of the States in insurrection and the rest of the United States. (12 Stat. L., p. 257.)
This act was carried out by the proclamation of the President on the 10th of August, 1861, and trade and intercourse between the two belligerents rendered unlawful, except a limited trade which the President was authorized to allow under the regulations of the Secretary of the Treasury.
We have seen, under the circumstances of this case, that the appointment of Henderson as the agent of the claimant violated no principle of the public law; the question now recurs, how it was affected by the “non-intercourse acts and the°proclamation of blockade by the President. The laws of Congress have, as we have attenrpted to show, no extra territorial effect, and these acts on their face purport to interdict no other trade than that between the inhabitants of loyal and disloyal States. This was the manifest object and intent of those statutes, and they could not, had it been otherwise intended, have had any other or wider scope than the territory of the United States. It is a universally admitted principle that the laws of one country are not binding on the citizens or subjects of another; *321 nor are subjects of one country, by a long series of adjudicated cases, bound to pay allegiance or respect to the laws of another, except when they come within their jurisdiction, or are in the act of breaking them.
At the time of the appointment of Henderson as the ag'ent of the claimant, there was no law in force in the United States that interdicted.trade between a neutral and resident citizen of the national or insurrectionary States; and none could have been enacted without at least great injury to the nation, and perhaps giving just ground of offense to neutral powers.
But, however this may be — and we do not undertake to decide . it now — the blockade was set on foot to meet this very difficulty, by cutting off free intercourse between neutral powers and the insurgent States. What was its effect, and how far was it operative to prevent such intercourse ?
It is admitted, in modern times, by all civilized nations, that a paper or constructive blockade is of no validity under the recognized law of nations. (The Peterhoff.\ 5 Wal., 50.) To make it effectual, it must be enforced by the presence of an efficient blockading squadron or military force. Now, was such a blockade enforced round the entire coast of the rebel States'? The case of The Peterhoffreferred to, (5 Wal.; 28,) holds the negative of this inquiry. The mouth of the Bio Grande was not included in the blockade, and indeed was never intended to be included by the national government. Trade by a neutral through this avenue with Texas, then an enemy, was not unlawful. (Ib.)
In fact, as a rule, under the authority of this case, the trade of neutrals in articles not contraband of war with belligerents is absolutely free unless interrupted by the blockade.
Applying these principles to the case in hand, it seems clear that intercourse between the claimant and Henderson constituted no violation of the blockade, either constructively or in fact. The way was open to communicate with him through the mouth of the Bio Grande; and without discussing now how far he could have carried on a lawful traffic with the interior of the rebel States, it is enough to say, he is not shown to have intended to violate the blockade, or to have introduced anything into the insurgent States contraband of war, or to have been in any way interrupted by the blockading force. How, then, can it be held, under any law, either public or municipal, *322 that the appointment of Henderson as agent, or the contracts made by him as such within the insurgent district, was unlawful, and inoperative to pass the title to the cotton in question1? The very opposite is true. And we hold that the appointment of Henderson was lawful, and the title to the cotton purchased by him as such passed to the claimant.
This brings us to the consideration of the question whether or not the proceeds of the cotton claimed are satisfactorily traced into the Treasury. This question is answered by the clear preponderance of the evidence. The proof establishes the fact of the seizure, and the shipment of the cotton on the cars, then under the exclusive control of the United States military forces, toward Chattanooga and Nashville; and that the cotton turned over to the Treasury agent at Nashville was all shipped (except one hundred and forty-three and a half- bales burned at Nashville) to Cincinnati, where it was sold, and the proceeds paid into the Treasury.
It is true the cotton is not identified, either at Nashville or Cincinnati, as the individual property of the claimant; but there seems to be no reasonable doubt that all the cotton coming from Georgia, Chattanooga, and points beyond there in Georgia, was received at Nashville and reshipped to Cincinnati, (except that burned at Nashville,) and there sold, and the proceeds regularly paid into the Treasury.
Besides, the cotton is traced beyond all question into the lawful custody of the United States military authorities, who by law were bound, under heavy penalties, to turn it over to the Treasury agents; and, in the absence of all proof to the contrary, we are bound to presume they discharged that duty. The case of John Silvey is decisive of this point. (4 O. Cls. B., 490.)
The only remaining question is as to the right of the claimant as an alien and subject of the government .of France to maintain this action under the second section of the Act 27th July, 1808, (15 Stat. L., p. 243.) This act is a flat bar, as we have heretofore held, to the suit of all aliens in this court, unless they can bring themselves within the proviso contained in the second section.
The proof of the French law in this cáse is identically the same as the proof in the cases of the Rothschilds and of Dauphin, decided at the present term of this court, and in which we held *323 that tlie government of France accords to citizens of the United States the privilege of prosecuting claims against that government in its courts, substantially as they can by law prosecute claims in this court against the government of the United States. Those cases are decisive of this case, and justify the same ruling.
We hold the claimant entitled to recover the net proceeds of two hundred and seventy-five bales of upland cotton, which we find to be $113,059 35, and direct judgment to be entered for that sum.